UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHRISTOPHER A. MITCHELL,

            Plaintiff,                          Case No. 2:17-cv-905
                                                JUDGE EDMUND A. SARGUS, JR.
        v.                                      Chief Magistrate Judge Elizabeth P. Deavers


MICHAEL WEINIG, INC.,

            Defendant.


OPINION AND ORDER

        This matter is before the Court on Defendant Michael Weinig, Inc.'s ("Defendant" or

"Weinig") Motion for Summary Judgment (ECF No. 76) and Motion to Exclude Expert Report

and Testimony (ECF No 78); Plaintiff Christopher Mitchell's ("Plaintiff" or "Mitchell") responses

to the motions (ECF No. 83, 84), and Weinig's replies (ECF Nos. 85, 86). Also, before the Court

is Plaintiff's Motion to Schedule a Jury Trial (ECF No. 87).

        For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED in**

**part** and **DENIED in part** (ECF No. 76), Defendant's Motion to Exclude is **DENIED** (ECF No.

78), and, Plaintiff's Motion to Schedule a Jury Trial is **GRANTED**. (ECF No. 87).

I.

        This case arises from a workplace injury that Plaintiff Christopher Mitchell suffered on

October 22, 2015. (Compl. ¶¶ 13–18). Mitchell resides in New Boston, Ohio. (Mitchell Dep. 6:5–

6). At the time of the injury, Mitchell was employed at Appalachian Wood Floors ("AWF"), a

hardwood flooring manufacturer with approximately twenty employees, located in Portsmouth,

Ohio. (Jim Graf. Dep. 8:16–18; Compl. ¶2). Mitchell was injured at AWF while operating an

industrial wood flooring line manufactured by Defendant Weinig and installed at AWF. (Compl. ¶¶ 1–18). Weinig is a North Carolina corporation with its principal place of business in Mooresville, North Carolina. (Compl. ¶3; Answer ¶ 3).

### A. Weinig Flooring Line purchased and installed at AWF

In September of 2014, AWF contracted with Defendant for the purchase of an industrial woodworking machine known as the "Weinig Automated High Speed Flooring Line" ("the Weinig line" or "the line"). (Andrew Graf Dep. 12:16–18, Ex. 34, at Weinig 0061). Weinig began shipping the line to AWF from Germany in August of 2015. (Andrew Graf Dep. 18:3–7). The line would be used to process the lumber received by AWF as part of its hardwood flooring manufacturing. (Chris Gilbert Dep. 13;18 14:21).

The purchase order contract for the line specified that the purchase from Weinig included "installation" and "training." (Andrew Graf Dep. at Ex. 34, at Weinig 0061). The contract did not specify the scope of Weinig's training obligation. (*See id.*). AWF President Andrew Graf handled negotiations with Weinig and signed the purchase order contract on behalf of AWF. (*Id.* at 11:4–12:18). Graf testified on deposition that Defendant Weinig was responsible for training AWF employees on the line and that Weinig's training obligation would not be limited to a certain number of AWF employees. (*Id.* at 69:22–70:2, 75:1–5). AWF CEO Jim Graf testified to the same on deposition – that Weinig was responsible for training AWF employees who would operate the line. (Jim Graf Dep. 57:14–18).

After AWF received the line components in August of 2015, Weinig sent technicians from Germany to begin installation and training on the line. (Bernd Schaffer Aff. ¶ 3; Gilbert Dep. 18:1–16). Andrew Graf selected AWF employee Chis Gilbert to oversee the line's operation. (Andrew Graf Dep. 20:14–19). Graf and another AWF employee, Kenny Holsinger, received training by

Weinig on the line. (*Id.* at 20:21–21:8). Weinig states that it only contractually agreed to train Chris Gilbert, Kenny Holsinger, and Andrew Graf. (Def.'s Resp. to Pls. Req. for Admis. 2). Those three employees all received some amount of training from the Weinig technician sent from Germany, Bernd Schaffer, along with other Weinig technicians sent to AWF. (Schaffer Aff. ⁋ 3; Andrew Graf Dep. 21:1–8; Gilbert Dep. 28:13–21; Kenny Holsinger Dep. 24:6–10). Weinig had "six to seven" different personnel on site at AWF for training. (Andrew Graf Dep. 32:11).

According to Gilbert, Defendant Weinig did not send enough people to test run the line themselves, so AWF pulled employees in to help test the line alongside Weinig's technicians. (Gilbert Dep. 26:23 –27:8). Installation took longer than planned. (Andrew Graf Dep. 18:13–18). But AWF and Weinig were able to begin running material through the line a few weeks before Mitchell's October 22 injury. (Andrew Graf Dep. 18:13–19:2). AWF did not accept the line as fully installed until November 13, 2015, three weeks after Mitchell's injury, which permitted Weinig technicians to leave AWF. (Gilbert Dep. 98:2–12; Andrew Graf Dep. 75:1–17). But according to Andrew Graf, the line was not fully operational as he expected it to be when he signed the Bill of Receipt and Acceptance on November 13, 2015. (Andrew Graf Dep. 75:1–17). The November 13 receipt also certified that Andrew Graf and Chris Gilbert had completed training. (Gilbert Dep. 97:22–98:12).

### B. Operation of the Weinig Line

The section of the Weinig line relevant to Mitchell's injury is the vacuum lift area. (Medlock Aff. at Ex. 1; Schaffer Aff. ⁋ 5; Andrew Graf Dep. 33:24–34:7). In that area, stacks of wood are placed on a lifting table. The lifting table moves the stack of wood upwards while a vacuum de-stacker lowers to pick up the wood. The vacuum de-stacker then picks up the wood, transfers the wood overtop a chain conveyor, and places the wood onto the conveyor. The chain

conveyor then moves the wood onto the next phase of the line. (Medlock Aff. at Ex. 1; Kutchek Dep. at Ex. 1).

Two employees at a time operate this area of the lift. (Holsinger Dep. 22:8). One employee's job is to operate the machine, while the other's responsibility is to stand at the ready in case the operator needs assistance. (*Id.* at 22:8–12). As the employees operate the machine, they directly face the chain conveyor. (Mitchell Dep. at Ex. 6). The vacuum lift area is located immediately to the operators' right; it transfers wood from the operators' right and places it directly in front of the operators onto the chain conveyor. (*Id.*).

As the two employees operate the system, they stand on a raised wooden platform. (Gilbert Dep. 43:9–12). According to AWF employee Gilbert, the elevated wooden platform was necessary for line operators to help them get to a height where they could straighten up the lumber as it moved along the conveyor. (*Id.* at 44:3–6). Operators at AWF during this training/installation period also used the added wooden platform and a small wooden box on top of the platform to climb onto the chain conveyor to remove wood if it was too far to reach. (*Id.* at 47:12–20). Weinig maintains that the wooden platform was not part of the line's design specifications. (Medlock Aff. at Ex. 1). AWF built and added the wooden platform to the line, but CEO Jim Graf testified on deposition that one of Weinig's technicians requested that the platform be built. (Gilbert Dep. 43:17–44:6; Jim Graf Dep. 37:4–14). Weinig's operating instruction manual appears to show a user operating the line while standing on an elevated surface like the wooden platform used by AWF. (Mitchell Dep. at Ex. 21, at Weinig 0670).

The vacuum lift area is separated from the chain conveyor and operator station by a guard fence. (Mitchell Dep. at Ex. 6). The purpose of the fence is to keep operators out of the vacuum lift area because exposure to the vacuum lift while in operation could result in fatal injury if the

4

user became crushed by the lift. (Medlock Aff. at Ex. 1; Mitchel Dep. at Ex. 21, at Weinig 0623). A warning sign is attached to the fence a few feet away from the operator platform, near eye level. (Mitchell Dep. at Ex. 6). The warning sign is a pictograph. The pictograph shows a red circle with a diagonal line running from the top left to the bottom right, known as a prohibition sign. (Mitchell Dep. at Ex. 13; Gilbert Dep. 60:2–12). Contained within the prohibition circle and slash is a drawing of an operator with a bolded black palm outstretched, all five fingers extended. (*Id.* at Ex. 13). There are no words on this pictograph or the fence. (*Id.*).

The control panel to operate the system is immediately to the operators' left as they face the conveyor. (Mitchell Dep. at Ex. 6). The control panel contains several buttons. (*Id.* at Ex. 8). Particularly relevant to this case, the panel contains a red mushroom-shaped button in the bottom left which operates as the emergency stop. (*Id.*). The panel also contains a different, smaller red button at the bottom that operates as a "Supply OFF button." (*Id.*). The emergency-stop button cuts off power and prevents motion on the entire line. (Kutchek Dep. at Ex. 1). The supply-off button only stops power to the chain conveyor and anything outside of the safety fence—it does not cut off power to the vacuum lift. (*Id.*; Andrew Graf Dep. 40:7–41:11).

During the few weeks of line operation before Mitchell's injury, the vacuum de-stacker routinely dropped boards onto the lift table as it moved a stack of wood from the lift area to the conveyor. (Branagan Dep. 15:16–17; Andrew Graf Dep. 23:9–20). When the vacuum dropped a board onto the lift table, it required the operator to clear out the board in order to resume operation. (Andrew Graf Dep. 23:18–20). Sometimes, an operator standing on the wooden platform would be able to use a chain deck to pull the board out of the area. (*Id.* at 23:23–24). But if an operator could not clear the fallen board from the platform, the fence guarding the lift area contained a safety gate through which a user could enter the area to clear out the board. (*Id.* at 24:6–11).

5

The purpose of the safety gate was to disable power to the vacuum de-stacker and lift table to allow a user to enter the area without the risk of being injured by the vacuum dropping. (Schaffer Aff. ¶ 5). The gate was located a few feet away from the wooden platform, and could be accessed by pushing a button, waiting for the vacuum to return to home position, and opening the gate. (*Id.*). Once the vacuum was in its home position, the lift could not be restarted until the gate was closed. (*Id.*). The lift restarted automatically after an operator closed the gate. (*Id.*).

Weinig technician Bernd Schaffer showed Gilbert and Holsinger how to access the safety gate to clear fallen boards safely from the lift area. (Schaffer Aff. ¶ 7; Gilbert Dep. 41:5–23). Gilbert and Holsinger went through the gate several times before Mitchell's accident. (Gilbert Dep. 39:12–40:2; Holsinger Dep. 24:6–18). So did Michael Branagan, another employee from AWF assigned to the line. (Branagan Dep. 15:4–16). Mitchell was not shown how to use the safety gate.

Gilbert testified that he stood on the conveyor to pull boards out that had fallen or become stuck. (Gilbert Dep. 66:18–67:24). Branagan testified that he also climbed on top of the conveyor to clear boards out, and that he had once stepped over the safety fence while standing on the conveyor to go into the life area and clear a board. (Branagan Dep. at 16:10–16). According to Weinig, the conveyor was not designed as a walking surface. (Futej Aff. at Ex. 1, 21). Weinig's instruction manual warns: "Do not climb onto conveyor elements." (Mitchell Dep. at Ex. 21, Weinig 0612). Gilbert testified that he saw Weinig technician Bernd Schaffer stand on top of the conveyor to clear boards out in the manner Gilbert did. (Gilbert Dep. 68:4–18) The safety fence guarding the lift area measured 71 inches in height above the ground, but only rose 27.75 inches above the surface of the conveyor. (Kutchek Dep. at Ex. 1, at 17).

6

## C. Mitchell's Injury

After Mitchell's lunchbreak on October 21, 2015, he was assigned by his supervisor Roger Buruss to work as an operator at the lift area. (Andrew Graf Dep. 32:21–24; Mitchell Dep. 63:6–18). At that time, Mitchell had worked on production numbers for AWF and its predecessor for roughly 14 years. (Mitchell Dep. 41:3–42:23). Prior to his assignment on the line, Mitchell had no experience operating woodworking equipment such as chop saws, moulders, and end matchers (*Id.* at 47:23–48:5). Mitchell had no familiarity with emergency stop buttons and had never received any form of lockout/tagout training from AWF. (*Id.* at 62:2–15).

Mitchell recalls that, on October 21, he stood and watched Gilbert and Branagan work the line. (*Id.* 73:14–20). He testified that he was not getting trained, only observing, and that he learned "nothing." (*Id.* at 75:12–77:3). He did not receive training from Weinig. (*Id.* at 91:12–15; 109:9–10). Mitchell observed the line operate for a few hours. (*Id.* at 75:6–8). Mitchell remembers seeing Gilbert and Branagan stand on top of the conveyor to "watch the wood." (*Id.* at 73:24–74:7). He also remembers seeing "a guy from Weinig" stand on the conveyor the day before Mitchell was assigned to the line. (*Id.* at 75:3–7). Mitchell was not aware of the safety gate and was not told anything about the safety fencing. (*Id.* at 91:6–25). Mitchell never observed anyone access the safety gate on the line. (*Id.* at 95:10–13). He described that his job was to "make sure the boards I guess just kept coming through the line." (*Id.* at 69:3–7).

Mitchell came to work the next morning around 7:00 a.m. and began working the line with Gilbert. (*Id.* at 84:5–14). Gilbert discussed with Mitchell how to operate the control panel that contained the emergency-stop button and the supply-off button. (*Id.*). Mitchell says that the only thing Gilbert told him was, "If you want to stop the line, you hit the red button." (*Id.* at 100:13–

7

14). Mitchell had no discussions with anyone who worked for Weinig about the control panel. (*Id.* at 102:4–10).

Mitchell's accident happened at 8:48 a.m. (*Id.* at 116:11). Gilbert stepped away from the platform to investigate a problem on a different part of the line, leaving Mitchell alone on the platform. (Gilbert Dep. 78:10–21). After Gilbert stepped away, Mitchell observed a board drop from the vacuum onto the lift table. (Mitchell Dep. 118:7–9). Mitchell then pressed the red supply-off button on the control panel to his left. (Kutchek Dep. at Ex. 1, at 9). Mitchell believed that this button was the red button Gilbert referred to when he told him that pressing the red button would stop power to the line. (Mitchell Dep. 119:13–16).

After pressing the button, Mitchell climbed onto the conveyor, believing that power to the line had been shut off. (*Id.* at Ex. 1, at 10; Mitchell Dep. 118:16). Mitchell then stepped his right foot overtop of the safety fence, straddled the top of the fence, and moved into the lift area underneath the vacuum de-stacker which was in a raised position. (Kutchek Dep. at Ex. 1, at 11). When Mitchell cleared the board from underneath the vacuum, the vacuum automatically resumed operation and pinned Mitchell onto the lift table. (*Id.*). AWF employees then activated the emergency stop and pulled Mitchell out from under the vacuum. (*Id.* at 12). Mitchell fractured his vertebrae, ribs, and pelvis and was airlifted to the hospital (Mitchell Dep. at Ex. 3).

Mitchell stated that he would not have climbed onto the conveyor and over the fence had he known that the button he pressed was not the emergency stop. (*Id.* at 119:12). When asked during his deposition about the pictograph warning sign on the fence, Mitchell said he was standing "maybe five feet" from the sign and that he is sure he saw it. (*Id.* at 107:14–21). Mitchell says that he interpreted the sign to mean "Stop." (*Id.* at 107:24).

It it undisputed that Weinig has an instruction manual for the Weinig line. Weinig technician Bernd Schaffer stated that, "the Weinig mechanization employees were responsible for training the AWF employees . The company has a copy of the operating manual. The company has an operating manual book at the machine and an extra copy. They also have a CD." (Second Schaffer Aff. ¶ 3).

Mitchell was shown the Weinig line instruction manual for the first time at his deposition. (*Id.* at 132:9). Mitchell had no knowledge that a manual existed. (*Id.* at 134:5). The instruction manual contains detailed instructions about how to operate the machine. (*Id.* at Ex. 21). It also contains detailed warnings against climbing on the conveyor. Further, the instruction manual indicates that the pictograph warning label posted on the safety fence means: "**No access.** Risk of fatal injury. Before entering this area switch off the power supply and secure it against being switched on again inadvertently." (*Id.* at Ex. 21, at Weinig 0623). Mitchell, after looking at this description, stated that "it could have been a game changer" and that he would not have done what he did had he seen the manual. (*Id.* at 133:25–136:23).

In is not disputed that no AWF employee recalls ever seeing the instruction manual. Gilbert testified that he did not receive any manuals before Mitchell's accident (Gilbert Dep. 69:12). Branagan testified that he was never given an operator's manual or instruction manual on how to operate the machine. (Branagan Dep. 41:13–15). Andrew Graf stated that he did not recognize the manual and did not know if the manual was present at AWF prior to Mitchell's accident. (Andrew Graf Dep. 28:17–21).

The parties dispute whether AWF ever received the instruction manual before Mitchell's injury. Weinig employee Edeltraud Fraske states that Weinig shipped the instruction manual via DHL to AWF from Germany in September of 2015. (Fraske Aff. ¶ 3). Fraske claims that Weinig

9

received a signed receipt confirming receipt of the instruction manual by AWF on September 21, 2015. (*Id.*). The receipt shows the signature of AWF CEO Jim Graf and reads: "We confirm that the documentation for the new mechanical handling system infeed and outfeed with order no. 120.283 & 120.284 was handed over us [sic] by the Weinig technician." (Jim Graf Dep. at Ex. 43). Graf was asked about this in his deposition: "Do you recall—do you recall whether when you received Exhibit 43 if the manual marked Defendant's 21 came with that document?" (*Id.* at 30:16–18). Graf responded: "It absolutely did not." (*Id.* at 30:19). Graf also stated that he "was never handed any kind of manual. (*Id.* 30:14–15).

Andrew Graf did not have any concern about Mitchell's level of training "because Weinig technicians were all right there" with AWF employees as they operated the lift. (Andrew Graf Dep. 33:14–18). Gilbert testified that "I guess I would've been" responsible for training Mitchell on October 21 and 22. (Gilbert Dep. 91:23). But Gilbert stated that he "didn't have training all the way either." (*Id.* at 91:24). He also stated that he was only "showed how to start [the machine] and make it move. Again, it was just in testing. We was helping them." (*Id.* at 97:5–7). In other words, AWF employees were assisting Weinig in the test phase of the line. Gilbert stated that he felt Mitchell "was trained to what [Gilbert] knew, but [Gilbert] also felt that we could've been trained more." (*Id.* at 116:21–22). Gilbert further stated that he "believed the same thing" when told that Mitchell believed the button he pressed made it safe for him to step over the fence. (*Id.* at 99:16–23).

Andrew Graf testified that Weinig did not provide the training to AWF employees it represented it would during sale negotiations. (Andrew Graf Dep. 75:1–5). Graf stated that AWF employees were not trained correctly on the entire line. (*Id.* at 83:9–18). Branagan testified that he did not have "adequate" information to work "safely" in the area that there could have been

better training. (Branagan Dep. 39:7–10). Holsinger testified that he did not believe he was properly trained to operate the line. (Holsinger Dep. 44:4–7). Holsinger stated that he needed to learn, "[m]ore about the control panels. There's a lot of buttons on there." (*Id.* at 44:10–11).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v.*

*Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III.

Mitchell asserts: (A) product liability claims under the Ohio Product Liability Act, Ohio Rev. Code § 2307.74, *et seq.* ("OPLA"); (B) negligence claims; and (C) a claim for punitive damages. Weinig moves for summary judgment on all Mitchell's claims.

**A. Product Liability Claims under the OPLA**

Mitchell asserts claims under the OPLA for: (1) design defect; (2) failure to warn; and (3) manufacturing defect.

**1. Design Defect**

Mitchell argues that the Weinig line was defective in design. To prevail on a design defect claim, a plaintiff must establish: (1) the product was defective; (2) the defect existed when the product left the defendant's control; and (3) the defect directly and proximately caused his injury. *Butts v. OMG, Inc.*, 612 F. App'x 260, 262 (6th Cir. 2015).

"A product is defective in design or formulation if at the time it left control of its manufacturer, the foreseeable risks associated with its design or formulation . . . exceeded the benefits associated with that design for formulation." Ohio Rev. Code § 2307.75(A). "Foreseeable risk" means a risk of harm that is both: (a) "associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question" and (b) "is a risk that the manufacturer in question should recognize" while exercising "the attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess" and "any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question should possess." *Id.* § 2307.71(A)(6).

12

The statute lists five non-exclusive factors for determining the foreseeable risks associated with a product's design, and three non-exclusive factors for determining the benefits associated with the product's design. *See id.* § 2307.75(B)–(C). A manufacturer is not responsible for all product misuses, but a "failure to design a product to prevent a foreseeable misuse can be a design defect." *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.*, 107 Ohio App. 3d 218, 224 (1995) (citing *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St. 3d 75, 78 (1984)).

Furthermore, a product is *not* defective in design if "at the time the product left control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm . . . without substantially impairing the usefulness or intended purpose of the product." *Id.* § 2307.75(F). The plaintiff bears the burden of proving alternative design. *Monroe v. Novartis Pharm. Corp.*, 29 F. Supp. 3d 1115, 1124 (S.D. Ohio 2014) (citing *McGrath v. Gen. Motors Corp.*, 26 F. App'x 506, 510 (6th Cir. 2002)). Thus, to survive summary judgment, a plaintiff must produce sufficient evidence of a safe alternative design. *Rees v. W.M. Barr & Co., Inc.*, 736 F. App'x 119, 129 (6th Cir. 2018).

The "foreseeable uses of a product, foreseeable risks associated with a product, benefits associated with a product, and consumer expectations regarding a product's uses and risks are ordinarily all factual questions." *Welch Sand & Gravel, Inc.*, 107 Ohio App. 3d at 225 . Consequently, "summary judgment will rarely be granted in design-defect cases when any of these elements is disputed." *Id.* at 534; *see also Butts*, 612 F. App'x at 263 (when both "foreseeable risks and benefits of a product exist, the balancing of the two is best done by a jury."). Summary judgment for a defendant manufacturer is only appropriate when "a product is used in a capacity which is clearly unforeseeable by the manufacturer and completely incompatible with the product's design." *Id.* at 533.

13

Weinig argues that it is entitled to summary judgment because: (a) Mitchell climbing the safety fence from the top of the conveyor was not a foreseeable use that Weinig should have recognized; and (b) because Mitchell has not come forward with evidence of a design defect. (Def. Mtn. Summ. J. at 20–21). Viewing the evidence in the light most favorable to Mitchell, the Court disagrees.

### a. There are genuine disputes of material fact about whether Mitchell's use of the Weinig line was foreseeable.

Weinig argues that Mitchell climbing over the safety fence from the top of the chain conveyor was unforeseeable because: Mitchell did not use the line as it was intended to be used; Weinig's instruction manual gave multiple express warnings not to climb onto the conveyor or climb the fence; and this type of injury has never happened before and has not happened since. (*Id.* at 21). According to Weinig, "it is neither logical nor predictable that an employee would climb onto a conveyor and breach a barrier guard with an access door meant for this activity located less than ten feet from the operator's station." (Medlock Aff. at Ex. 1, at 8).

Mitchell does not dispute that stepping over the safety fence from the conveyor to clear wood from the lift area was not the intended use of the machine. (Pls. Resp. to Def.'s Mtn. Summ. J. at 10). Mitchell, however, posits that his use of the Weinig line was nonetheless reasonably foreseeable because Weinig warns against that exact conduct, yet Weinig failed to convey that warning to Mitchell.

Further, Weinig technicians were on site at AWF in the month leading up to Mitchell's injury and on the day of Mitchell's injury and knew the vacuum lift was routinely dropping wood before reaching the chain conveyor, which required a line operator to clear out the wood that was stuck under the lift. Line operators also climbed onto the conveyor to clear wood. Indeed, AWF

14

employee Michael Branagan testified that he stepped over the safety fence from the top of the conveyor to clear wood from the vacuum lift area "the same [Mitchell] has." (Branagan Dep. 16).

Chris Gilbert stated that he also climbed onto the chain conveyor to grab wood. (Gilbert Dep. 67). Gilbert is one of the three AWF employees that Weinig admits it had a duty to train. (Def.'s Resp. to Pls. Request for Admis. 2) Gilbert was also Mitchell's supervisor for the day Mitchell worked on the Weinig line prior to his injury and the morning of Mitchell's injury. (Gilbert Dep. 96). Gilbert testified that he observed the Weinig's technicians climbing onto the conveyor to keep boards straight. (*Id.* at 68).

Importantly, Mitchell testified that he personally observed both Gilbert and Branagan climbing onto the conveyor the day before his injury. (Mitchell Dep. 74). The safety fence surrounding the vacuum lift was approximately 71 inches tall measured from the ground, but only rose 27.75 inches above the top of the conveyor (Kutchek Dep. 71). Consequently, a user standing on the conveyor can step over the safety fence in a way that would not have been possible from the ground. (*Id.*).

Weinig's expert states that "the chain conveyor was never designed, or reasonably expected, to satisfy the basic requirements for a safe walking surface" and thus "the chain conveyor was never intended, or reasonably foreseen, as a means of accessing" the fence surrounding the vacuum lift. (Futej Aff. at Ex. 1, 21). Weinig also relies on the fact that it warns against standing on the chain conveyor; the instruction manual states: "Do not climb onto conveyor elements." (Mitchell Dep. at Ex. 21, Weinig 0612). However, as just stated *supra*, Mitchell has presented evidence that trained AWF employees and Weinig's own technicians walked on top of the chain conveyor in the same manner Weinig now claims it could not have reasonably foreseen.

15

Moreover, Mitchell never received formal training on how to access the safety gate to properly clear wood from the lift area. (*Id.* at 76–77, 95). Mitchell was also never informed which button on the control panel was the emergency stop. (*Id.* at 94, 99). And Kenny Holsinger, who did received training, stated that he needed more training on "the control panels" because, "There's a lot of buttons on there." (Holsinger Dep. 44). The parties contest whose responsibility it was to provide this information to Mitchell. But all three of the AWF supervisors whom Weinig admits it had a duty to train testified that Weinig did not train them adequately. (Gilbert Dep. 96, 116; Holsinger Dep. 44; Andrew Graf Dep. 83).

Viewing the facts in the light most favorable to Mitchell, and drawing all reasonable inferences in his favor, the Court cannot conclude that Mitchell's use of the Weinig line was "clearly unforeseeable" as a matter of law. *Welch Sand & Gravel, Inc.*, 107 Ohio App. 3d at 224. Instead, the Court finds that a reasonable jury could conclude from these facts that Weinig should have foreseen an employee using the line in the manner that caused Mitchell's injury.

### b. Mitchell has come forward with enough evidence of a design defect to defeat summary judgment.

Weinig next contends that Mitchell has not presented evidence of a defect. Weinig asserts that, because the fence was already more than 71 inches tall from the ground, making the fence any taller would not have prevented injuries arising from any reasonably foreseeable uses of the Weinig line. (Def.'s Mtn. Summ. J. at 23–24). Weinig argues that mere feasibility of making a safer product does not establish the existence of a defect. (*Id.*) (citing *Bourne v. Marty Gilman, Inc.*, 453 F.3d 632, 638 (7th Cir. 2006) (Indiana law); *Queen v. Hunter's Mfg. Co., Inc.*, No. 5:16-CV-2262, 2018 WL 6840872, *10 (N.D. Ohio Dec. 31, 2018) (Kentucky law)).

According to Weinig, AWF installed a raised wooden platform next to the conveyor that was "not part of Weinig's design." (*Id.* at 22). This platform "further reduced the distance to the

16

top of the safety fence by placing a wooden box on top of the platform to make it easier for the operator to climb onto the conveyor, despite Weinig's multiple warnings in the instruction manual against climbing onto the conveyor." (*Id.* at 22 note 3; *see also* Medlock Aff. at Ex. 1, at 5 ("AWF modified the work area around the chain conveyor by building a platform for the operators to stand on. This platform, at 27 inches high, reduced the height of the conveyor to 34 inches and made it more accessible."))

Mitchell responds that there are genuine disputes of fact regarding the risks and benefits of the design utilized by Weinig. (Pls. Resp. to Def.'s Mtn. Summ. J. at 11–12). This Court agrees.

Mitchell cites to Weinig's instruction manual as evidence that the wooden box was part of Weinig's design specifications. (*Id.* at 11; Mitchell Dep. at Ex. 21, at Weinig 0670). Mitchell maintains that a reasonable jury could find that there was a foreseeable danger of a potentially fatal injury if the lift area remained exposed and unguarded because the fence was not tall enough above the conveyor to prevent someone from stepping over the fence. (*Id.*). Mitchell's expert opines:

- "The guard fence which Weinig installed over the chain conveyor and in front of the vacuum destacker was a height which was easily defeatable by stepping over or straddling, rendering it ineffective."

- "If Weinig would have installed the 71 inch guard fence over the chain conveyor in front of the vacuum destacker, they would have provided a more effective safeguard and better protection for personnel."

- "A safer alternative was feasible and available to Weinig. This alternative was known to Weinig and used by them in other areas of the machine. The provision of an available safer alternative would not have defeated the utility of the machine and would not have imposed a significant cost penalty."

(Kutchek Dep. at Ex 1, at 17).

Weinig maintains that the elevated platform (which reduces the distance from the floor to the conveyor, making it easier for a user to climb onto the conveyor) was not part of Weinig's design. However, Mitchell is correct that Weinig's instruction manual shows a drawing of a line

17

operator standing on an elevated surface in the exact same location that the disputed wooden box was located when Mitchell's injury occurred. (Mitchell Dep. at Ex. 21, at Weinig 0670). AWF's CEO Jim Graf testified that the wooden platform was built by AWF, but that "Weinig was the one that requested it be built." (Jim Graf Dep. 37).

Moreover, Weinig technicians were on site installing the line and working with AWF employees during the entire timeline relevant to this case. Weinig's technicians knew that line users were utilizing the wooden platform when working at the conveyor. That Weinig's technicians would have seen the wooden platform used daily leading up to Mitchell's injury undercuts Weinig's contention that the platform was not part of the Weinig line's design.

Mitchell has also demonstrated a genuine dispute about the risks and benefits associated with Weinig's design of the line. *See* Ohio Rev. Code § 2307.75(A). Mitchell's expert opines that the guard fence failed to comply with industry standards because the fence "does not prevent access to the hazard" and can be "easily defeated by stepping over or straddling." (Kutchek Dep. at Ex. 1, at 18). Further, Weinig's warning posted on the outside of the guard fence indicated that there is a "risk of fatal injury" for a user entering the area without switching off the power supply. (Mitchell Dep. at Ex. 21, at Weinig 0623). The balancing of these disputed foreseeable risks and benefits "is best done by a jury." *Butts*, 612 F. App'x at 263.

Mitchell has also come forward with sufficient evidence of a safe alternative design. Ohio Rev. Code § 2307.75(F); *Rees*, 736 F. App'x at 129. Both parties offer competing expert reports on this issue. Weinig characterizes Mitchell's expert as only offering the opinion that a higher fence would have been "more effective" or "better." (Def.'s Mtn. Summ. J. at 23). The Court disagrees. Mitchell's expert has explained why the safety fence was inadequate and how it led to Mitchell's injury, and has offered an alternative design. (Kutchek Dep. at Ex. 1, at 17).

The perimeter fence surrounding the guard area was measured at 71 inches tall from the *floor*. (*Id.*). Mitchell's expert proposes the alternative design of a fence that is 71 inches above the *surface of the conveyor*. (*Id.*). The fence on guarding the lift area at the time of Mitchell's injury only measured 27.75 inches above the surface of the conveyor. (*Id.*)

According to Mitchell's expert, it was foreseeable that users would walk on top of the conveyor. (*Id.*). It follows, then, that Weinig should have installed a fence that was 71 inches tall from the surface of the conveyor, because the purpose of a guard fence is to keep people from entering the area it surrounds. (*Id.*) A 27.75-inch-high fence was not tall enough to prevent line users who were walking on top of the conveyor from entering the hazardous area—the area under the vacuum lift. (*Id.*). But a fence measuring 71 inches from the conveyor's surface would have accomplished this purpose because a user would not have been able to step over or straddle a fence of that height. (*Id.*) Mitchell's expert concludes that, because Weinig used fences that were 71 inches tall to keep employees (who were on the ground, not an elevated surface) out of hazardous areas around the perimeter of the line, the 71-inch-high fence design was known to Weinig and could have been used to prevent a user from entering the vacuum lift area from the conveyor. (*Id.*)

Mitchell's expert also opines that the proposed alternative design would not have impaired the utility of the machine and "would not have imposed a significant cost penalty." (*Id.*). Regarding the utility of using a taller safety fence, Kenny Holsinger and Andrew Graf stated that they were aware of no reason why the fence could not have been made taller. (Holsinger Dep. 48; Andrew Graf Dep. 73). Holsinger and Graf were both familiar with the Weinig line because they are two of the three AWF employees Weinig trained.

Accordingly, there are genuine factual disputes about the "foreseeable uses" of the Weinig line, the "foreseeable risks associated with" the line, and the "benefits associated with" the line.

*Welch Sand & Gravel, Inc.*, 107 Ohio App. 3d at 225. Furthermore, Mitchell has come forward with sufficient evidence of a safe alternative design to defeat summary judgment. *See* Ohio Rev. Code § 2307.75(F). Because these elements are genuinely disputed, Weinig is not entitled to summary judgment on Mitchell's design defect claim.

### 2.   Failure to Warn

Mitchell's second OPLA claim is for failure to warn. The statute provides that a product is "defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:"

> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>
> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

Ohio Rev. Code § 2307.76(A)(1).

"Courts have restated the above statutory language as requiring three elements each of which must be satisfied: (1) a duty to warn against reasonably foreseeable risks; (2) breach of this duty; and (3) an injury that is proximately caused by the breach." *Monroe v. Novartis Pharm. Corp.*, 29 F. Supp. 3d 1115, 1125 (S.D. Ohio 2014) (quoting *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 514 (6th Cir. 2003) (internal quotations omitted)).

Weinig argues that it is entitled to summary judgment because: (a) it had no duty to warn Mitchell individually because it reasonably relied on AWF to warn; (b) the warnings it provided

were adequate; and (c) any alleged inadequacy of the warnings was not the proximate cause of Mitchell's injury. (Def.'s Mtn. Summ. J. at 24–33).

Mitchell counters that summary judgment is improper because there are genuine issues of material fact underlying all three elements. The Court agrees.

### a. There is a genuine dispute of fact regarding Weinig's duty.

Weinig contends that it discharged its duty to warn Mitchell by "providing the instruction manual and training to Mitchell's supervisors at AWF and reasonably relying on AWF and its supervisors to provide a copy of the instruction manual to Mitchell and adequately train him." (*Id.* at 32). Weinig makes two assertions on this point. First, that "it is undisputed Weinig provided AWF with the Weinig line instruction manual that included multiple prominent warnings against climbing onto the conveyor, over the safety fence, and under the lift." (*Id.* at 25). Second, that "it is also undisputed Weinig trained AWF's supervisors that the only safe way to clear a dropped board from under the lift was to go through the safety gate." (*Id.* at 26).

Weinig cites *Adams v. Union Carbide Corp.* to support its reasonable reliance argument. 737 F.2d 1453 (6th Cir. 1984). In *Adams*, the Sixth Circuit affirmed the district court's grant of summary judgment to a manufacturer on a negligent failure to warn claim under Ohio law. *Id.* at 1458. The plaintiff was an employee at General Motors. *Id.* at 1454. The plaintiff sued the manufacturer of TDI, a chemical used in the automobile assembling process, after she developed a respiratory condition known as "TDI asthma" from her exposure to the chemical. *Id.* She claimed that the manufacturer of TDI negligently failed to warn General Motors and its employees of the harmful effects of TDI. *Id.* The manufacturer argued that the warnings it provided to General Motors discharged its duty of care to warn individual employees of General Motors who were

likely to come into contact with the chemical. *Id.* at 1455. The district court agreed, granting summary judgment in favor of the manufacturer. *Id.*

In affirming, the Sixth Circuit relied on comment n to Restatement 2d of Torts § 388: "the restatement advises that the manufacturer's duty to warn may be discharged by providing information of the dangerous propensities of the product to a third person (GMC in the instant case) upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who will be exposed to its hazardous effects." *Id.* at 1456. The Court explained that, in that case, it was undisputed that the manufacturer had repeatedly updated General Motors about TDI and had relayed "comprehensive information concerning the use of TDI … for the express purpose of dissemination to GMC's employees." *Id.* at 1457. Thus, it was reasonable for the manufacturer to rely on General Motors, who had a duty to provide a safe working environment, to convey the information about the hazards of TDI to the employees who encountered it. *Id.*

Weinig's actions are distinguishable from the manufacturer in *Adams*. In that case, it was *undisputed* that the manufacturer provided "comprehensive information" to the employer about the use of its hazardous product. *Id.* In this case, whether Weinig provided the instruction manual to AWF at all is very much in dispute. Mitchell points out that the "evidence strongly indicates" that Weinig never provided its instruction manual to AWF. (Pls. Resp. to Def.'s Mtn. Summ. J. at 12; Mitchell Dep. 132; Gilbert Dep 69–70; Jim Graf Dep. 29–31; Andrew Graf Dep. 28–30; Holsinger Dep. 44; Branagan Dep. 41). And, in "the absence of that *Instruction Manual* and any other documentation, a reasonable jury could easily conclude that the Defendant" failed to provide a warning as required by the statute. (*Id.* at 12–13). Mitchell testified that, had he seen the

instruction manual, it would have been a "game changer" and he would not have done what he did. (Mitchell Dep. 136).

The facts as presented by Weinig are supported by two affidavits from two of its German employees that are offered as proof that it delivered the instruction manual to AWF. Bernd Schaffer, a Weinig technician who was present at AWF overseeing installation of the line and training of AWF stated: "the Weinig mechanization employees were responsible for training the AWF employees on the infeed system. The company has a copy of the operating manual. The company has an operating manual book at the machine and an extra copy. They also have a CD." (Second Schaffer Aff. ⁋ 2). Weinig Employee Eldetraud Fraske testified in his affidavit that in "September 2015, the Instruction Manual was shipped via DHL from Weinig AG to AWF in Portsmouth, Ohio" and that Weinig received a signed receipt from AWF on "September 21, 2015, over one month before" Mitchell's accident. (Fraske Aff. ⁋ 4).

In contrast to the Weinig employees' affidavits, every AWF employee deposed in this case who was asked about the instruction manual testified that they never saw the manual prior to Mitchell's accident. (Mitchell Dep. 132; Gilbert Dep 69–70; Jim Graf Dep. 29–31; Andrew Graf Dep. 28–30; Branagan Dep. 41). The receipt that Weinig puts forth as conclusive proof that it delivered the manual contains AWF CEO Jim Graf's signature, and states: "We confirm that the documentation for the new mechanical handling system infeed and outfeed with order no. 120.283 & 120.284 was handed over us [sic] by the Weinig technician." (Jim Graf Dep. at Ex. 43). However, Graf testified at his deposition that he "absolutely did not" receive the manual and that he "was never handed any kind of manual." (*Id.*).

Thus, the evidence before the Court presents disagreement that requires submission to a jury to determine whether Weinig ever provided the instruction manual to AWF. The manual

contains detailed instructions about operating the line and includes a written description of the warning sign posted on the safety fence next to the conveyor. (Mitchell Dep. at Ex. 21). The Court also finds that there are genuine disputes regarding the training Weinig provided. It is undisputed that Weinig never trained Mitchell on the Weinig line. AWF had only just begun installation of the new line a few weeks prior to Mitchell's injury, and AWF had not accepted the machine as fully installed before Mitchell's injury. Weinig technicians did show some AWF employees how to properly access the safety gate to safely enter the vacuum lift area. (Schaffer Aff. ¶ 5; Gilbert Dep. 41; Holsinger Dep. 24). But, per Weinig's records, the employees Weinig did train did not complete their training until November 13, 2015—nearly a month after Mitchell's injury. (Gilbert Dep. 98). Those employees also testified that Weinig never trained them adequately. (Gilbert Dep. 97, 116; Andrew Graf Dep. 83; Holsinger Dep. 44). And, as discussed at length above, none of those employees was ever shown the instruction manual.

Furthermore, Michell raises a genuine dispute about whether it was Weinig or AWF's responsibility to warn him about the line's hazards. The purchase order agreement between Weinig and AWF states that "training" is included with the delivery and installation of Weinig's line. (Andrew Graf Dep. at Ex. 34, at Weinig 0061). Weinig claims that it only agreed to train three AWF employees. (Def.'s Resp. to Pls. Request for Admis. 2). But the written agreement contains no language limiting Weinig's obligation to three employees: AWF CEO Jim Graf testified that it was his understanding that Weinig would be responsible for training AWF on Weinig's line. (Jim Graf Dep. 57).

AWF President Andrew Graf testified that AWF and Weinig never agreed that Weinig would limit its training obligation to only a certain number of employees. (Andrew Graf Dep. 69–70, 75). When asked, "Did you have any concerns about whether Mr. Mitchell had received

adequate training to be assigned to that area?" Graf responded, "No, because the [Weinig] technicians were all right there with us as we were doing it." (*Id.* at 33). Viewing the facts in the light most favorable to Mitchell, Weinig has not shown it discharged its duty to warn Mitchell by reasonably relying on AWF, because Weinig led AWF to believe that Weinig would warn employees directly.

In sum, a host of factual disputes preclude this Court from granting summary judgment on the basis that Weinig discharged its duty to warn Mitchell through reasonable reliance on AWF.

### b. There is a genuine dispute of fact regarding whether the warnings provided were adequate.

Weinig next posits that it did not breach its duty to warn because the warnings it provided were adequate. Specifically, it argues that the warning label provided on the fence surrounding the vacuum lift was sufficient to warn a user of the risk of entering the area. It further argues that any additional on-product warning labels would make it more likely users would "ignore all the warnings clutter, thereby increasing any dangers attendant to using the product." (Def.'s Mtn. Summ. J. at 27).

Mitchell responds that the on-product warning was not adequate. (Pls. Resp. to Def.'s Mtn. Summ. J. at 13). Plaintiff argues that, because he was not provided with "access to the Instruction Manual, Mr. Mitchell was left with only a single ambiguous pictograph to provide warning. Unfortunately, the pictograph did not provide sufficient information." (*Id.*). Both parties rely on experts to opine on the adequacy of the warnings given by Weinig. Mitchell presents the opinion of Dr. Nancy Grugle, a Human Factors expert,[1] who concludes: "The pictograph fails to provide adequate information to someone who has not, for example, been trained or read the user manual

---

[1] Weinig has filed a motion to exclude Dr. Grugle's expert opinion as irrelevant. For the reasons discussed in Section IV of this opinion, the Court denies Weinig's motion.

because it is not explicit and the hazard is not clearly identified, the consequences of encountering the hazard are not clearly identified, and instructions for avoiding the hazard are not clear, specific, or detailed." (Grugle Dep. 72).

"Under Ohio law, a warning is adequate if it reasonably discloses all inherent risks, and if the product is safe when used as directed." *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 452 (6th Cir. 2000) (citing *Crislip v. TCH Liquidating Co.*, 52 Ohio St. 3d 251 (1990)). "The fact finder may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed." *Seley v. G. D. Searle & Co.*, 67 Ohio St. 2d 192, 198 (1981).

Weinig cites to *Hatcher v. SCM Grp. N. Am., Inc.* to support its argument that the warning was adequate and that any additional on-product label would have diluted the effect of its warning. 167 F. Supp. 3d 719 (E.D. Pa. 2016). The plaintiff in *Hatcher* sued the manufacturer of a woodworking machine for failure to warn under Pennsylvania law. *Id.* at 722. The plaintiff was injured after using the machine at work without the blade guard. *Id.* The front of the machine contained a warning which stated: "DON'T RUN THE MACHINE WITHOUT NECESSARY SAFETY GUARDS." *Id.* Furthermore, the accompanying operating manual explained "in detail how to use and assemble each of the safety guards" and warned, "Before starting machine, make sure all guards are in place." *Id.* The undisputed facts established that the plaintiff "never read the existing warnings on the machine or the manual, *even though he knew the manual was available at the plant*." *Id.* at 727 (emphasis added). The plaintiff also admitted "that if he had read the manual, he would have known how to use the blade guard." *Id.*

The court reasoned that additional on-product warnings would "diminish the likelihood of an operator *reading the manual* so as to become aware of all the safety requirements." *Id.* (citation

26

omitted) (emphasis added). The court granted summary judgment for the manufacturer, holding that the danger of the spinning blade was obvious; and "the warnings provided on the machine *and in the accompanying manual* were adequate to alert the operator of any unobvious dangers[.]" *Id.* at 727–28 (emphasis added).

The facts here differ materially. In *Hatcher*, the product was accompanied with a conspicuous written warning. *Id.* at 722. Here, the on-product warning label was a pictograph with no accompanying words. (Mitchell Dep. at Ex. 13). More importantly, there is a genuine dispute about whether Weinig ever provided AWF with the line's instruction manual. The court in *Hatcher* relied heavily on the fact that the plaintiff had access to the instruction manual and admitted that, had he read the manual, he would have known how to use the blade guard. *Id.* at 727–28. Mitchell similarly testified that, had he read the manual, it would have been a "game changer" and he would not have done what he did. (Mitchell Dep. 136). But its unclear whether Mitchell ever had access to that manual.

Moreover, a reasonable jury could find that the pictograph on the fence, by itself, was inadequate in "its factual content, its expression of the facts, or the method or form in which it is conveyed." *Seley*, 67 Ohio St. 2d at 198 . Mitchell, at this deposition, interpreted the pictograph to mean, "Stop." (Mitchell Dep. 108). But the meaning of the pictograph as described in the instruction manual reads: "**No access.** Risk of fatal injury. Before entering this area switch off the power supply and secure it against being switched on again inadvertently." (Mitchel Dep. at Ex. 21, at Weinig 0623). And, while it was obvious to Mitchell not to go under the lift while it was in operation, (*Id.* at 106), Mitchell mistakenly believed that he triggered the emergency stop because he did not receive training on how to operate the machine, nor did he receive the instruction manual which explained how to safely operate the machine. (*Id.* at 157, 160). Mitchell also presents expert

27

testimony on this point. Thus, a jury could find that the pictograph alone did not adequately warn Mitchell of the danger of entering the vacuum lift area.

### c. There are genuine disputes regarding whether Weinig's alleged failure to warn proximately caused Mitchell's injury.

Weinig makes several arguments supporting its position that Mitchell has failed to raise any genuine issue related to proximate cause. First, that Mitchell's unforeseeable use of the line was the sole proximate cause of his injuries. Second, AWF's failure to train Mitchell was an intervening cause. (Def. Mtn. Summ. J. at 13–14). The Court has already addressed these two arguments *supra* and concluded that there are genuine disputes regarding the foreseeability of Mitchell's use of the Weinig line and whether it was Weinig or AWF's responsibility to train Mitchell how to use the line.

Weinig next argues that because Mitchell "did not read the instruction manual and does not recall seeing the warning label on the vacuum lift's safety gate" he would not have been aware of any additional or more specific warnings Weinig could have provided. (*Id.* at 33). Lastly, Weinig asserts that Mitchell has not provided any evidence establishing that the alleged failure to warn caused his injury. (*Id.* at 34).

Proximate cause is ordinarily a question for the jury. *Vermett v. Fred Christen & Sons Co.*, 138 Ohio App. 3d 586, 612 (2000). But a defendant will be entitled to summary judgment when it is undisputed that the plaintiff would not have read any additional warning had one been provided. *See id*; *see also Wade v. Diamant Boart, Inc.*, 179 F. App'x 352, 355 (6th Cir. 2006) (holding that, since the plaintiff did not read the operator's manual, he would not have been aware of any additional or more specific warnings).

Mitchell has come forward with enough evidence of proximate cause to put the issue to a jury. Weinig's argument that proximate cause is lacking because Mitchell "did not read the

28

instruction manual" fails because whether Weinig ever provided Mitchell and AWF access to the manual is in dispute. Furthermore, Mitchell stated in his deposition that he was standing "maybe five feet" from the warning sign on the fence. (Mitchell Dep. 107). When asked, "did you see that [sign] either of those two days?" Mitchell responded, "*I'm sure I did*, but I just don't recollect it." (*Id.*) (emphasis added). A reasonable jury could conclude that, because Mitchell was five feet away from the sign and stated that he was "sure [he] did" see the sign, that Mitchell did in fact see the sign—even if he did not recall seeing it at the time of his deposition. Thus, Weinig is not entitled to summary judgment on grounds that Mitchell would not have read any additional or more specific warnings had Weinig provided those warnings because the facts underlying that contention are in dispute.

### 3. Manufacturing Defect

Mitchell's last OPLA claim is for manufacturing defect. Under OPLA, "[a] product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer[.]" *Id.* § 2307.74. "The plaintiff has the burden of proving the existence of a defect" to prevail on a manufacturing defect claim. *Miller v. ALZA Corp.*, 759 F. Supp. 2d 929, 941 (S.D. Ohio 2010). The plaintiff must also prove that the defect "was present when it the product left the hands of the manufacturer and proximately caused the claimed injuries." *Id.* (citing *State Farm Fire & Casualty Co. v. Chrysler Corp.*, 37 Ohio St.3d 1, 6–7 (1988) (abrogated on other grounds by statute)).

A plaintiff may prove the existence of a defect through circumstantial evidence. *Id.* "However, such circumstantial evidence must permit a jury to go beyond speculation and render a judgment in accordance with law." *Id.* (cleaned up). A defendant is entitled to summary judgment

if the plaintiff fails to provide evidence from which a reasonable jury could conclude that the product at issue was defective upon leaving control of the manufacturer. *Smitley v. Nissan N. Am., Inc.*, No. 2:09-CV-148, 2010 WL 3027915, at *4 (S.D. Ohio Aug. 2, 2010).

Mitchell has failed to provide evidence from which a jury could find the existence of a manufacturing defect. In the Complaint, Mitchell cites as the basis for his manufacturing defect claim that "despite the fact that Mitchell activated the emergency stop prior to clearing the lumber, the machine suddenly and unexpectedly activated and crushed Mitchell." (Compl. ¶ 32). However, discovery has revealed Mitchell failed to activate the emergency stop. Mitchell instead pressed a button that he *believed to be* the emergency stop. Rather than the emergency stop, Mitchell pressed a different red button on the same control panel that only stopped the conveyor instead of cutting off power to the entire line (which the emergency stop button would have done). Thus, even if the emergency stop button was defectively manufactured, it would not have been the proximate cause of Mitchell's injury.

Mitchell has failed to come forward with a different basis for his manufacturing defect claim. And Mitchell appears to concede that Weinig's position is accurate in that he does not address his manufacturing defect claim in his Response to Weinig's Motion for Summary Judgment. Therefore, Weinig is entitled to summary judgment on Mitchell's manufacturing defect claim.

Accordingly, on Mitchell's OPLA claims, this Court **GRANTS** summary judgment for Defendant on the manufacturing defect claim and **DENIES** summary judgment on the design defect and failure to warn claims.

## B. Negligence

Mitchell asserts two negligence claims; Weinig moves for summary judgment on both. Mitchell claims: (1) Weinig negligently failed to train Mitchell; and (2) Weinig negligently installed the line at AWF. (Compl. ⁋⁋ 20–31).

### 1. Negligent Training

For Mitchell's negligent training claim, Weinig argues that it owed no duty to train Mitchell under Ohio law because it lacked an employer-employee relationship with Mitchell. (*Id.*) Weinig also argues—as in arguments on Mitchell's failure to warn claim—it owed no duty to train Mitchell. Weinig maintains that it only assumed a duty to train *some* AWF employees, and that AWF had the sole responsibility to train its other employees. (Def.'s Reply in Sup. Mtn. Summ. J. at 7–8).

Under Ohio law, negligent training is a tort that allows a third party to recover against an employer when an employee commits a tort against the third party as a result of the employer's negligent failure to train. *Strock v. Pressnell*, 38 Ohio St. 3d 207, 217 (1988). That type of negligent training claim requires an employer-employee relationship. *Id.* It also requires that the employee be individually liable against the plaintiff for an act committed within the scope of the employee's employment. *Id.*

While Mitchell labeled his negligence claim "Negligent Training" in the Complaint, Mitchell has clarified throughout this case that he is alleging that Weinig was negligent under the elements of ordinary negligence. (*See* Compl. At ⁋⁋ 20–25). Specifically, Mitchell claims that Weinig assumed a duty to train Mitchell directly. (Pls. Resp. to Def.'s Mtn. Summ. J. at 16).

The elements of a negligence claim are the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach. *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St.

31

3d 75, 77 (1984). To survive a defendant's motion for summary judgment on a negligence claim, "a plaintiff must identify a duty owed to him by the defendant." *Adelman v. Timman*, 117 Ohio App. 3d 544, 549 (1997).

"The existence of a legal duty is a question for the court, unless alternate inferences are feasible based on the facts." *Grover v. Eli Lilly & Co.*, 63 Ohio St. 3d 756, 762 (1992). Once a duty of care is established, it is for the fact finder to determine if the defendant breached its duty. *Commerce & Indus. Ins, Co. v. Toledo*, 45 Ohio St. 3d 96, 98 (1989). "The existence of duty largely depends on the foreseeability of injury. The test for foreseeability is whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act." *Id.* (internal citations omitted).

If the facts are in dispute on the issue of foreseeability, summary judgment is improper. *See, e.g.*, *In re E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-MD-2433, 2015 WL 4943966, at \*4 (S.D. Ohio Aug. 19, 2015) (denying summary judgment on Ohio and West Virginia negligence claims because the facts regarding the foreseeability of harm were genuinely disputed) (citing, *inter alia*, *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984); *Grover v. Eli Lilly & Co.*, 63 Ohio St. 3d 756, 762 (1992); *Commerce & Indus. Ins, Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989)).

The parties' arguments about duty pull the Court into a mixed realm of tort and contract. Mitchell argues that Weinig assumed a duty to train Mitchell because it agreed to train AWF employees in purchase order contract. (Pls. Resp. to Def.'s Mtn. Summ J. at 16). Further, Mitchell argues that, because Weinig admits it had a duty to train at least *some* AWF employees, its failure to adequately train those employees resulted in a foreseeable risk of harm to Mitchell. In support,

Mitchell cites to a case from this district applying Restatement 2d of Torts § 324A, which generally holds that, where one party undertakes to render services to another involving the protection of a third person, the party can be liable to the third person if those services are negligently performed. *Clark v. W & M Kraft, Inc.*, No. 1:05-CV-00725, 2007 WL 120136, at *7 (S.D. Ohio Jan. 10, 2007).

The Ohio Supreme Court has not expressly adopted § 324A. *Hill v. Sonitrol of Sw. Ohio, Inc.*, 36 Ohio St. 3d 36, 42 (1988). In *Hill*—the only Ohio Supreme Court case to consider § 324A—the court held that it need not adopt § 324A(C) because it did not apply anyway. *Id.* The plaintiff failed to set forth any evidence that her employer relied on the defendant to protect its employees; thus, there was no evidence that the defendant should have foreseen its services as necessary to protect the plaintiff. *Id.* However, several Ohio courts have adopted § 324A, which guides this Court's analysis. *See Root v. Stahl Scott Fetzer Co.*, 2017-Ohio-8398, ¶ 35; *Stevens v. Jeffrey Allen Corp.*, 131 Ohio App. 3d 298, 305 (1997).

Further, the Ohio Supreme Court has held that a party can be liable for the negligent performance of a contractually assumed duty if it was foreseeable that the failure to exercise reasonable care in performance of that duty would injure a third person. *Durham v. Warner Elevator Mfg. Co.*, 166 Ohio St. 31, 37 (1956). In this instance, liability is not "dependent upon any contractual relation between the person injured and the contractor but on the failure of the contractor to exercise due care in the performance of his obligation." *Id.*

With these cases and Mitchell's arguments in mind, there are two ways Weinig could have "have anticipated that injury to the plaintiff or to those in like situations [was] the probable result of the performance or nonperformance" of Weinig's training and thus owed Mitchell a duty of care. *Commerce & Indus. Ins., Co.*, 45 Ohio St. 3d at 98 : First, Weinig could have assumed a duty

of to train Mitchell directly through the purchase order contract; second, Weinig could have

foreseen that failing to adequately train the AWF employees it admits it had a duty to train would

result in injury to other AWF employees like Mitchell. The Court concludes that there are genuine

disputes of fact on both points.

The purchase order contract is ambiguous regarding the extent of Weinig's duty to train.[2]

Page two of the contract states in handwriting that "training" is included with the purchase of the

line with no other references to the scope of that training. (Andrew Graf Dep. at Ex. 34, at Weinig

0061). Weinig points to another provision, contained in the terms and conditions of sale, which

reads:

> "Purchaser acknowledges and agrees that . . . [the line] can cause
> serious injuries or death if all safety precautions are not taken or **if
> the [line is] used improperly or [is] accessible to unqualified,
> untrained, unsupervised, inexperienced or careless personnel;
> that only fully and properly trained and alert personnel will be
> allowed to work with or near [the line]**; that all personnel shall be
> constantly alert to possible safety hazards on or around [the line];
> **that all warnings, safety instructions and recommendations, and
> maintenance and operating instructions shall be thoroughly
> reviewed and followed by every employee working with [the
> line] before and after [the line is] put into operation**; that all
> machinery shall be turned off at the first sign of any potential
> problem and all moving parts shall be allowed to come to a complete
> stop before any maintenance, cleaning, clearing, service or
> adjustment is attempted. . . ."

(Def.'s Third-Party Compl. at Ex. 1, at 3, ¶ 8) (emphasis added).

Weinig contends that the language in this paragraph means that AWF expressly assumed

sole responsibility to train Mitchell and to ensure that no untrained personnel would operate the

---

[2] The terms and conditions contain a North Carolina choice of law provision, but that provision is limited
to claims "between Seller and Purchaser." (Def.'s Third Party Compl. at Ex 1, at 3, ¶10). Regardless, the
Court need not engage in a choice of analysis for purposes of this motion because the law of Ohio and
North Carolina agree that, when a contract is ambiguous, interpretation is a question of fact and resort to
extrinsic evidence is necessary. *See Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 267 (2001);
*Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 220 (2003).

Weinig line. While Weinig admits that it owed AWF a contractual duty to train some employees, it argues that its duty was limited to Andrew Graf, Chris Gilbert, and Kenny Holsinger. (Def.'s Resp. to Pls. Request for Admis. 2). However, this provision says nothing about the scope of Weinig's duty to provide "training" to AWF employees during installation of the Weinig line. The contract itself does not contain such a limitation. AWF President Andrew Graf, who negotiated the purchase order contract on behalf of AWF, testified that AWF and Weinig never agreed that Weinig would limit its training obligation to only a certain number of employees. (Andrew Graf Dep. 69–70, 75). AWF CEO Jim Graf testified that Weinig was responsible for training all AWF employees who would operate Weinig's line. (Jim Graf Dep. 57). Thus, there is a genuine dispute of fact regarding the scope of Weinig's contractual duty to train AWF employees. And, Weinig has admitted that it never provided any training to Mitchell.

There is also a genuine dispute about whether Weinig could have foreseen that failing to adequately train the AWF employees it did train would result in injury to Mitchell. Weinig admits it had a duty to train some AWF employees. Mitchell has come forward with evidence that:

- Weinig was "supposed to send people [to AWF] to help run the line, and they didn't have enough people to do it," so AWF had to bring people onto the line to help "test run the line." (Gilbert Dep. 26–27);

- Weinig was on site and had knowledge that Mitchell was working the line even though he received no formal or informal training on how to safely operate the line;

- Another AWF employee who was pulled into working the line was not given adequate safety training. (Branagan Dep. 39);

- The three AWF employees Weinig claims it had a duty to train all testified that they did not feel they received adequate training. (Gilbert Dep. 96, 116; Holsinger Dep. 44; Andrew Graf Dep. 83);

- Weinig never provided the line's instruction manual to anyone at AWF. (Mitchell Dep. 132; Gilbert Dep 69–70; Jim Graf Dep. 29–31; Andrew Graf Dep. 28–30; Branagan Dep. 41);

Mitchell also presents expert testimony about the quality of the training AWF employees received from Weinig, and how the quality of that training affected those employees' ability to convey necessary information to Mitchell. (Schaible Dep. 64). Under these facts, a reasonable jury could determine that it was foreseeable to Weinig that negligently performing its contractual duty to train some AWF employees would result in harm to other employees working the line.

Thus, Weinig is not entitled to summary judgment on Mitchell's negligence claim.

### 2. Negligent Installation

Weinig also moves for summary judgment on Mitchell's claim that Weinig was negligent in its installation of the Weinig line. Mitchell pleaded in the Complaint that Weinig failed to install the line "in a safe, professional and workmanlike manner" and that Weinig's "employee damaged the control panel components of the machine prior to Mitchell's accident." (Compl. ¶ 27). Weinig has identified several facts in the record to refute this claim. (Def.'s Mtn. Summ J. at 37–38). Mitchell was asked during his deposition, "the allegation that whatever he did when he hit the panel that that caused the panel to malfunction, that's total speculation; right?" Mitchell responded, "It is. But I'm just wondering why he was sitting there punching on it to start off with." (Mitchell Dep. 150–51). Mitchell has not pointed any evidence in the record to support this speculation. Accordingly, Mitchell has not demonstrated a genuine issue of material fact on the negligent installation claim and Weinig is entitled to summary judgment.

### 3. Comparative Fault Bar

Weinig contends it is entitled to summary judgment on Mitchell's negligence claims because Mitchell's comparative fault bars recovery. (Def.'s Mtn. Summ. J. at 35). Under Ohio law, a plaintiff cannot recover damages for negligence if his comparative fault exceeds the combined tortious conduct of all other parties. Ohio Rev. Code § 2315.33.

Comparative fault is for the jury to resolve "unless the evidence is so compelling that reasonable minds can reach but one conclusion." *Simmers v. Bentley Constr. Co.*, 64 Ohio St. 3d 642, 646 (1992). For the reasons discussed above, reasonable minds can reach different conclusions about the fault of the parties in this case. Thus, the determination of comparative fault in this case is a question for the jury.

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's negligence claim and **GRANTS** Defendant's Motion on Plaintiff's claim for negligent installation.

### C. Punitive Damages Claim

Weinig also moves for summary judgment Mitchell's claim for punitive damages. Weinig correctly points out that a "punitive damages claim is a derivative action that must be dismissed where the primary claim is subject to summary judgment." *Stolz v. J & B Steel Erectors, Inc.*, 76 F. Supp. 3d 696, 703 (S.D. Ohio 2014). Here, Mitchell has negligence and OPLA claims that have survived summary judgment. Therefore, Weinig's motion for summary judgment on Mitchell's claim for punitive damages is **DENIED.**

### IV.

The Court next takes up Defendant's Motion to Exclude Report and Testimony of Plaintiff's Expert Nancy Grugle. (ECF No. 78).

Dr. Nancy Grugle earned her B.S. in Indusial and Systems Engineering from Ohio university, and her M.S. and Ph.D in Human Factors; Industrial Engineering from Virginia Polytech Institute and State University. She is a licensed Certified Human Factors Professional ("CHFP") Dr. Grugle is licensed by the Board of Certification in Professional Ergonomics. Dr. Grugle has worked on similar cases involving issues of energy control and training related to

workplace safety, and controlling those exposures. She has also written numerous peer reviewed publications, made several presentations, and participated on panels in the human factors area. (Grugle Dep. at Ex. 5). Dr. Grugle offers opinions about the adequacy of the warnings Weinig provided to Mitchell for purposes of Mitchells failure to warn claim under the OPLA.

Weinig also presents expert reports and testimony about the adequacy of Weinig's warnings. Weinig's expert, Gerald Futej, opines in his report that it is "reasonable to conclude that Weinig provided an internationally accepted warning that indicated not to enter the Vacuum Destacker area . . . Weinig did not deprive the operator of the Infeed Section of sufficient warning of the potential danger. However, AWF failed to properly train the employees as to how to respond to the warning signs provided by Weinig." (Futej. Aff. at Ex. 1, at 33–34). Weinig's expert, Rob Medlock, states in his report: "Pictograph warning signs were designed with the appropriate color scheme and were clear in the message they wished to convey which is that the machine has the potential to be dangerous if not accessed properly." (Medlock Aff. at Ex. 1, at 8).

### A. Standard

Rule 702 of the Federal Rules of Evidence governs the use of expert testimony, providing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

This rule, as amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("In *Daubert* the Court charged trial

judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").

This Court has broad discretion to determine whether to admit or exclude expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). The burden is on the party proffering the expert report and testimony to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

Determining the admissibility of expert testimony entails a flexible inquiry and any doubts should be resolved in favor of admissibility. *Daubert*, 509 U.S. at 594; Fed. R. Evid. 702 advisory committee's notes, ("[A] review of the case law. . . shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony" (internal quotations omitted)). Additionally, if the evidence is deemed admissible by a court, but it is ultimately found "insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." *Daubert*, 509 U.S. at 596; *see also* Fed. R. Civ. P. 50.

As to Rule 702, the Sixth Circuit explains:

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. *First*, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. *Second*, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* *Third*, the testimony must be reliable. *Id.* Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the

"product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (emphasis added).

### B. Analysis

In the case *sub judice*, Weinig challenges admissibility only on relevance, the second noted inquiry. *See id.* Under Rule 702 and *Daubert*, an expert opinion is not admissible unless it is relevant to the facts at issue in the case. *Daubert*, 509 U.S. at 590–90; *Price v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (applying *Daubert's* relevance inquiry; the testimony is not relevant if there is no "connection between the [opinion] being offered and [any] disputed factual issues" that are before a court).

Weinig argues that Dr. Grugle's opinions about the adequacy of the warnings are irrelevant because: (1) Mitchell and his coworkers saw the pictograph label and understood the warning it conveyed"; (2) the instruction manual instructed users the safe way to enter the lift area is through the safety gate; and (3) a more explicit warning would not have deterred Mitchell from climbing over the safety fence, so Dr. Grugle's opinions are irrelevant because a more explicit warning label would not have deterred Mitchell from climbing the fence. (Def.'s Mtn. Exclude at 7). The Court disagrees with Weinig's contentions. As discussed at length above in the analysis of Mitchell's OPLA failure to warn claim, there are genuine disputes of fact regarding all three of Weinig's arguments for excluding Dr. Grugle's testimony.

First, Dr. Grugle's opinions bear directly on the issue of whether Weinig provided adequate warnings. She acknowledged in her deposition that the warnings provided in the instruction manual were adequate (Grugle Dep. 71), but there is a genuine factual dispute as to whether Weinig ever provided AWF with the instruction manual. On this point, Dr. Grugle explains: "My opinions are . . . limited to, for example, the fact that Weinig failed to provide the instruction manual to

Mitchell in accordance with their own policies. And then, [my opinions] specifically related to the warning that was placed on the fence—that pictograph on the fence." (*Id.* at 72).

Dr. Grugle's offers the opinion that the pictograph "fails to provide adequate information to someone who has not . . . been trained or read the user manual because it is not explicit and the hazard is not clearly identified, the consequences of encountering the hazard are not clearly identified, and instructions for avoiding the hazard are not clear, specific, or detailed." (*Id.*). Dr. Grugle's opinion about the pictograph is especially relevant because the jury "may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed." *Seley*, 67 Ohio St. 2d at 198.

Furthermore, both expert reports Weinig put forth in its motion for summary judgment offer opinions about the adequacy of the pictograph on the fence. (Futej. Aff. at Ex. 1, at 33–34; Medlock Aff. at Ex. 1, at 8). Thus, Weinig undercuts its own contention that Dr. Grugle's opinions are irrelevant because it also offers expert reports on the same disputed topic. Because Dr. Grugle's opinions are relevant, the Court **DENIES** Defendant's motion to exclude her testimony.

## V.

The last matter before this Court is Plaintiff's motion for a trial to be scheduled in this action. (ECF No. 87.) Defendant opposed, arguing that if summary judgment is granted there will be no need for trial. (ECF No. 88.) Shortly after Plaintiff's motion was filed, Judge George C. Smith recused himself from this case and the undersigned was randomly assigned to it. (ECF No. 89.) This Court in its normal course schedules trials in cases that survive summary judgment and will do so in this case regardless of whether a party so moves. Accordingly, while it is unnecessary to move the Court for a trial schedule, the Court **GRANTS** Plaintiff's request and will issue its trial schedule forthwith.

## VI.

For the reasons stated above:

(1) Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. (ECF No. 76).  Specifically, with regard to Plaintiff's OPLA claims, the Court **GRANTS** summary judgment for Defendant on the manufacturing defect claim and **DENIES** summary judgment on the design defect and failure to warn claims.  The Court **DENIES** summary judgment on Plaintiff's negligence and punitive damages claims and **GRANTS** summary judgment on Plaintiff's claim for negligent installation.

(2) Defendant's Motion to Exclude is **DENIED**. (ECF No. 78).

(3) Plaintiff's Motion to Schedule Jury Trial is **GRANTED**. (ECF No. 87).

**IT IS SO ORDERED.**


_9- 28-2020_
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**

42